IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| DANNY LEE WARNER, JR., | CV 19–103–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| VIRGINIA HILL, JILL BUCK, and KRISTINA NEU, | |
| Defendants. | |

Before the Court is United States Magistrate Judge Kathleen L. DeSoto's Findings and Recommendations regarding Defendants Virginia Hill, Jill Buck, and Kristina Neu's motion for summary judgment (Doc. 73) and rulings on Plaintiff Danny Lee Warner's motion for sanctions (Doc. 94) and Defendants' motion for leave to file an over-length brief (Doc. 95). (Docs. 97, 101.) Judge DeSoto granted Defendants leave to file an over-length brief (Doc. 97), denied Plaintiff's motion for sanctions (Doc. 101 at 31), and recommends that the Court grant Defendants' motion for summary judgment (*id.*). Warner has filed objections to all of these rulings. (Docs. 99, 102.) For the reasons stated herein, the Court will adopt Judge DeSoto's findings and recommendations in full.

1

**BACKGROUND**

Warner's complaint alleges that the defendants assaulted him, violated his constitutional rights, and misdiagnosed him while he was committed to the custody of Montana's Forensic Mental Health Facility ("FMHF") pending a state-court criminal trial.  (*See generally* Doc. 2.)[1]  In particular, he claimed he was misdiagnosed as not having a mental disease or defect and that Defendants violated his constitutional rights by not providing the least restrictive conditions necessary, routinely conducting pat searches, establishing a punitive environment for pretrial detainees, denying outdoor recreation, denying food, not allowing him to practice his religion, assaulting him, denying him medical attention and treatment, utilizing a "level" system to determine each resident's privileges, and removing him from his pain medication.  (*Id.* at 5–9.)  Defendants filed a motion for summary judgment.  (Doc. 73.)

**STANDARD OF REVIEW**

On review of a magistrate judge's findings and recommendations, a party is only entitled to de novo review of those findings to which he or she specifically objects.  28 U.S.C. § 636(b)(1)(C).  A proper objection must "itemize each factual finding of the magistrate judge to which objection is made, identifying the

---

[1] Many of the claims alleged in the complaint were dismissed on various grounds.  (*See generally* Doc. 30.)

evidence in the record the party relies on to contradict that finding" and/or "itemize each recommendation of the magistrate judge to which objection is made, setting forth the authority the party relies on to contradict that recommendation[.]"  L.R. 72.3(a).  In the absence of a proper objection, this Court reviews for clear error. *See Thomas v. Arn*, 474 U.S. 140, 149 (1985).  Clear error review is "significantly deferential" and exists when the Court is left with a "definite and firm conviction that a mistake has been committed."  *United States v. Syrax*, 235 F.3d 422, 427 (9th Cir. 2000) (citations omitted).

As before in this case, (*see* Doc. 30 at 6), Warner largely does not lodge specific objections to Judge DeSoto's findings and recommendations.[2]  To that extent, the Court has reviewed Judge DeSoto's analysis for clear error and finds none.  Where Warner has specifically objected, the Court will conduct de novo review.

---

[2] For example, Warner "specifically objects to <u>all</u> analysis by the Magistrate on the grounds that she did not in any way view the facts or evidence presented by [Warner] in the light most favorable to a pro se prisoner <u>or</u> the nonmoving party, let alone give him the benefit of <u>any</u> doubt whatsoever."  (Doc. 102 at 2.)  This "specific" objection does not identify any particular facts or evidence purportedly analyzed under an improper legal standard.  (*See also, e.g.*, *id.* (arguing that Judge DeSoto ignored facts "throughout his verified complaint, response brief, and statement of disputed facts" without identifying any particular facts).

**DISCUSSION**

## I.    **Defendants' Motion for Summary Judgment**

Federal Rule of Civil Procedure 56(a) entitles a party to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The movant bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has satisfied its burden, the non-moving party must go beyond the pleadings and designate by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.      Conditions of Confinement Claims**

**1.      Standard for Claims**

Judge DeSoto concluded that Warner's conditions of confinement claims as a pretrial detainee on criminal charges referred for an evaluation under Section 46-14-202 of the Montana Code should be evaluated under the standard for pretrial detainees rather than the "least restrictive conditions necessary" standard found in Section 53-21-142(2) of the Montana Code.  (Doc. 101 at 4–8.)  Accordingly, Judge DeSoto applied the standard for pretrial detainees' conditions of confinement claims reiterated in *Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018), which requires Warner to prove:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (ii) those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (iv) by not taking such measures, the defendant caused the plaintiff's injuries.
>
> "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn[ ] on the facts and circumstances of each particular case."

5

*Id.* at 1125 (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

Despite arguing that the Court should apply this standard in his opposition to Defendants' motion for summary judgment (Doc. 92 at 2), Warner now argues that his conditions of confinement claims must be analyzed exclusively under Montana Code Section 53-21-142, which provides that "[p]atients [admitted to a mental health facility, whether voluntarily or involuntarily] have a right to the least restrictive conditions necessary to achieve the purposes of commitment." (Doc. 102 at 2.) He argues that this provision applies to all residents of FMHF "no matter what name the court gives them[,]" (Doc. 102 at 2), but this argument ignores that the statute in question defines "patient" as "a person committed by the court for *treatment* for any period of time or who is voluntarily admitted for *treatment* for any period of time." Mont. Code Ann. § 53-21-102(14) (emphases added). As Warner himself argues, he "was not committed for treatment, but for evaluation" in the context of his pretrial detention pending state criminal charges. (Doc. 102 at 7.) By the statute's terms, Section 53-21-142 does not apply to him.

Warner also objects that the question of his status at FMHF was a disputed issue of material fact that should have been resolved in his favor for purposes of summary judgment. (Doc. 102 at 3.) The Court rejects this argument. Determining whether Warner was a pretrial detainee or a "patient" as defined by

Montana law is a question of law, which Judge DeSoto correctly resolved.  Warner

likewise mistakenly challenges Judge DeSoto's statement that "[w]hatever

conditions he encountered at FMHF can be compared to the conditions he would

have encountered at the Flathead County Detention Facility when the Court

considers whether those conditions were constitutionally sound" as a factual

finding that the conditions were actually similar, rather than the summation of the

applicable legal standard it actually was.  (Doc. 102 at 3.)  The factual differences

between each facility that he identifies are irrelevant.  Accordingly, Warner's

objections concerning the standard applied to his conditions of confinement claims

are overruled.

### 2.   Drink Limit

Judge DeSoto recommended summary judgment for Defendants on

Warner's claim concerning the three-drink limit in the canteen because he had

unlimited water available in his housing, and staff notes indicated he frequently

drank as much as he wanted in the canteen without repercussion.  (Doc. 101 at 8–

9.)  Accordingly, Judge DeSoto concluded that he did not abide by the policy, it

was not objectively unreasonable, and the policy did not cause Warner any harm.

(*Id.*)  Warner objects to Judge DeSoto's use of the word "canteen" instead of

dining hall, arguing that a canteen is a store where prisoners may purchase hygiene

or snack products.  (Doc. 102 at 4.)  This objection has no bearing on Judge

DeSoto's conclusions.  Warner also argues that Judge DeSoto failed to address his argument that the three-drink-per-meal limit was an "exaggerated response" under *Turner v. Safley*, 482 U.S. 78 (1987), (Doc. 102 at 4), but even if that argument had merit, Warner did not challenge Judge DeSoto's conclusions that Defendants were entitled to summary judgment on this claim because Warner did not suffer any injury as a result of the policy.  Accordingly, Warner's objections concerning this claim are overruled, and Judge DeSoto's findings and recommendations as to this claim are adopted in full.

### 3.   Religious Claims

Judge DeSoto recommended summary judgment for Defendants on Warner's religious claims under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").  (Doc. 101 at 9–11.)  As to his RLUIPA claim, Judge DeSoto noted that RLUIPA authorizes only injunctive relief, but because Warner is no longer detained at FMHF, any RLUIPA claim is moot.  (*Id.* at 9–10.)  As to his First Amendment claim, Judge DeSoto found that Warner failed to prove that he continued to seek access to the Poetic Edda and runes after he was told on May 25, 2017 that his request would be referred to the chaplain for assistance and he could purchase his own copies, and Warner failed to show that Defendants' decision to refer his request to the chaplain or suggest that he purchase those items himself put him at a substantial risk of serious harm or

caused him any serious harm.  (*Id.* at 10–11.)  Judge DeSoto further concluded that there was no evidence that Buck or Neu were involved in exchanges concerning the Poetic Edda or runes, and there thus was no basis to hold them liable.  (*Id.* at 11.)

Warner objects that it is an open question whether damages are available against FMHF on his RLUIPA claim, citing an unpublished decision from New York in which the court noted that the availability of damages from *municipalities* under RLUIPA was unsettled.  (Doc. 102 at 4.)  However, binding Supreme Court and Ninth Circuit precedent compels the conclusion in this Court that RLUIPA did not effect a waiver of *states*' sovereign immunity to private suits for money damages and did not authorize suits for damages against *state* officials in their individual capacities, and Warner's damages claims against state entities and officials thus must fail.  *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015).

Warner also objects that Judge DeSoto erred in finding that he did not seek access to the Poetic Edda or runes after May 25, citing a grievance attached to his complaint dated June 13, 2017, which states that he had "put in several requests for a 'Poetic Edda' . . . and been rebuffed," he had "asked for runes and other items but these requests have disappeared," and demands a copy of the Poetic Edda, a set of runes, and "$5000⁰⁰ for violating my rights[.]"  (Doc. 2-1 at 16; Doc. 75-32 at 21–22.)  He also objects to Judge DeSoto's finding that Buck was not involved in

any exchanges concerning the Poetic Edda or runes because she signed the

"Received By" line for that June 13 grievance.  (Doc. 75-32 at 22.)  However, this

grievance does not rebut Judge DeSoto's additional bases for recommending

summary judgment for Defendants on Warner's First Amendment claim, namely

that he failed to show that any intentional decision by Defendants placed Warner at

substantial risk of suffering serious harm or caused him any injuries.  This is not a

case in which a facility broadly prohibited possession of particular Odinist

literature within the facility, *see Borzych v. Frank*, 439 F.3d 388, 390–91 (7th Cir.

2006) (holding that ban of particular Odinist literature did not violate RLUIPA and

thus did not violate First Amendment), but rather a case in which mental health

professionals referred a resident's request for specific items of Odinist literature to

a chaplain and, for reasons not revealed by the record, no further action was taken

during the short time Warner resided at FMHF except for one subsequent demand

for the literature (and compensation) by Warner.  Warner produced no evidence

that the Defendants remaining in this case caused any substantial burden on his

religious exercise, and accordingly, Warner's objections concerning these claims

are overruled.

### 4.     Food

Judge DeSoto recommended summary judgment for Defendants on

Warner's claim relating to food because there was no evidence that he was ever

denied food based on refusal to submit to a pat search.  (Doc. 101 at 11.)  Warner

does not raise any objections concerning this claim.  The Court finds no clear error

in Judge DeSoto's findings and recommendations as to this claim and adopts them

in full.

### 5.    Outdoor Exercise

Judge DeSoto recommended summary judgment for Defendants on

Warner's claim that he was deprived of outdoor exercise because Warner had

access to an off-pod outside field at FMHF when he was on Level 3, and he "was

able to exercise frequently in a courtyard with access to fresh air . . . for the

duration of his circumscribed stay at FMHF, on top of his free daily movement

around his pod and access to other humans[,]" which made his case unlike any

others in which a constitutional violation was found based on lack of outdoor

exercise.  (Doc. 101 at 11–13.)

Warner objects to Judge DeSoto's reliance on cases involving convicted

prisoners rather than pretrial detainees in analyzing this claim, and he objects to

Judge DeSoto's reliance on visible sunlight, free daily movement, and access to

other people in considering whether his right to outdoor exercise was violated.

(Doc. 102 at 5–6.)  However, the case he relies on for the proposition that he has a

right to outdoor exercise is also a case involving convicted prisoners, which held

that "[d]eprivation of outdoor exercise violates the Eighth Amendment rights of

inmates confined to continuous and long-term segregation." *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996); *see also Wilson v. Seiter*, 501 U.S. 294, 304–05 (1991) (noting that Eighth Amendment required outdoor exercise when prisoners were otherwise confined in small cells almost 24 hours per day, but not when prisoners otherwise had access to dayroom 18 hours per day).  Judge DeSoto properly considered the totality of Warner's circumstances of confinement when analyzing his outdoor exercise claim and correctly concluded that the facts in this case are not comparable to any cases in which a lack of outdoor exercise rose to the level of a constitutional violation.  Accordingly, Warner's objections concerning this claim are overruled, and Judge DeSoto's findings and recommendations as to this claim are adopted in full.

### 6.   Access to Courts

Judge DeSoto recommended summary judgment for Defendants on Warner's access to courts claim because the record shows only two incidents in which Warner requested to speak to his stand-by lawyer and investigator, but the staff response showed that he was not forbidden from doing so, and he only alleges that he was forbidden to call his stand-by counsel during one of the alleged incidents of excessive force.  (Doc. 101 at 13–14.)  Accordingly, Judge DeSoto concluded that he failed to show any incident in which Defendants made decisions that put him at risk of substantial harm, because denial of a phone call at a

particular time does not constitute denial of access to a lawyer or the courts.  (*Id.* at

14.)  Warner does not raise any objections concerning this claim.  The Court finds

no clear error in Judge DeSoto's findings and recommendations as to this claim

and adopts them in full.

B.      **Claims Relating to "Levels"**

Judge DeSoto recommended summary judgment for Defendants on

Warner's claim alleging that he was denied procedural due process when his

"level" was dropped, which resulted in loss of privileges.  (Doc. 101 at 15–18.)

Judge DeSoto concluded that Warner had no constitutionally protected liberty

interest in being on any particular level in FMHF, and Warner did not establish that

the lowest level of privileges—Level 1—was unconstitutional.  (*Id.* at 15–17.)

Judge DeSoto further concluded that there was no state-created liberty interest.

(*Id.* at 18.)  Because Warner failed to prove a liberty interest, the Court considered

whether the level system served a legitimate nonpunitive governmental objective

and found that it did because its purpose is "maintaining security and order and

operating the facility in a manageable fashion[.]"  (*Id.*)

Warner's objections rehash his argument that he was entitled to notice, a

hearing, and "some kind of appeal process" before his level was dropped.  (Doc.

102 at 7–8.)  His argument that Section 53-21-142 of the Montana Code

establishes a liberty interest is meritless because, as discussed above, he was not a

"patient" as defined by the statute.  He also cites to a warning he was given for not redirecting from a desk, which stated that "AFTER THREE WARNINGS YOU WILL BE DROPPED TO LEVEL 2 BY THE FORENSIC TREATMENT TEAM[,]" arguing that he thus was entitled to three warnings before his level was dropped.  (Doc. 75-16.)  However, this document establishes that three warnings are *sufficient* for a level drop, but not that three warnings are *necessary* for a level drop.  For example, the very next exhibit explains that Warner's level was being dropped to a level 2 because "threatening staff is not tolerated[,]" indicating that some behaviors could justify an immediate level drop without additional warnings. (Doc. 75-17.)  The warning issued to Warner does not establish a liberty interest in receiving three warnings before a level drop.  Likewise, Warner's reliance on the "rights of patients" document, which states that the hospital must act in a lawful manner and be able to demonstrate why its action is necessary, does not entitle Warner to any particular process before his level is dropped.  (Doc. 102 at 8.)

Judge DeSoto next recommended summary judgment for Defendants on Warner's claim that FMHF could not treat or rehabilitate him as a pretrial detainee. (Doc. 101 at 18–19.)  Relying on *United States v. Hearst*, 563 F.2d 1331, 1345 n.11 (9th Cir. 1977), Judge DeSoto concluded that Warner had the right to refuse participation in treatment or rehabilitation programming, but he was not free to

refuse to comply with the basic rules of the facility, nor was he entitled to proceed beyond Level 1.  (Doc. 101 at 19.)

Warner's objection that Judge DeSoto "glosses over" his argument that "the very existence of the level system at the FMHF violates the constitution" because the purpose of the level system is behavioral modification (Doc. 102 at 6–7) is plainly meritless given the above-described analysis.  As best the Court can tell, Warner believes that his right to "assert his [pretrial detainee] status as a shield against intrusive practices aimed solely at rehabilitation[,]" *Hearst*, 563 F.2d at 1345 n.11, entitles him to the highest level of privileges available even if he refuses to participate in the level system.  In doing so, however, he erroneously equates denial of special privileges with punishment.  As Judge DeSoto correctly found, the baseline level of privileges, Level 1, was constitutionally adequate, and Warner thus had no entitlement to additional privileges or rewards if he refused to participate in the level system.  (Doc. 101 at 19.)   Accordingly, Warner's objections concerning his due process claims are overruled, and Judge DeSoto's findings and recommendations as to these claims are adopted in full.

### C.    Medical Claims

Judge DeSoto recommended summary judgment for Defendants on Warner's claim relating to treatment of his injuries during incidents in which he was taken to D-pod because (1) as to the June 8th incident, none of the named

defendants were participants in his injury treatment; (2) medical records show that he "was seen for his shoulder and scratch" on June 14th, and Warner merely asserts that the statements in those records are lies; (3) Warner's treatment request file contains many requests but none concerning follow-up care for his shoulder or scratch; and (4) he received a hip x-ray on June 28, 2017, which refutes his claim that he never got an x-ray.  (Doc. 101 at 20–21.)

Judge DeSoto recommended summary judgment for Defendants on Warner's claim that Dr. Hill withheld pain medication from him because the undisputed evidence shows that Dr. Hill made a medically reasonable decision to decrease his tramadol dosage for his old hip injury because the medication could have been contributing to his irritability and opiates were not medically indicated for long-term chronic pain.  (*Id.* at 21–22.)

Judge DeSoto declined to hear Warner's claims regarding Dr. Hill's ultimate diagnosis pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), because he was litigating similar claims in Montana state court.  (Doc. 101 at 22.)  Warner specifically objected to this finding, arguing that his state claims "are not similar in any way to his claims here.  There he is claiming that the judge had no authority or jurisdiction to order him to the state hospital at all, whereas here defendant Hill intentionally misdiagnosed him and should be held accountable for her actions[,]" which he argues would not affect his state proceedings.  (Doc. 102 at 2.)  This

16

objection misunderstands *Heck*'s limitation on federal courts.  "[W]hen a state

prisoner seeks damages in a § 1983 suit, the district court must consider whether a

judgment in favor of the plaintiff would necessarily imply the invalidity of his

conviction or sentence; if it would, the complaint must be dismissed unless the

plaintiff can demonstrate that the conviction or sentence has already been

invalidated."  *Heck*, 512 U.S. at 487.  The issue is not whether the legal questions

in Warner's state and federal proceedings are identical, but rather whether

resolving this question in his favor would impugn the validity of his conviction or

sentence.  Warner's chief objection to Hill's diagnosis is that she, "as part of her

conspiracy with the State's prosecutor . . . intentionally misdiagnosed him with the

one single diagnosis that would not meet the legal standard for mental disorder

under § 53-21-102(9)(a), MCA or mental disease under § 46-14-101(2)(a), MCA."

(Doc. 92 at 16 (internal quotation omitted).)  The implication of this argument is

that Hill intentionally avoided providing Warner a diagnosis that would call into

question his fitness to stand trial, whether he had at the time his state offense was

committed a state of mind that was an essential element of the offense, and

whether he was unable to appreciate the criminality of his behavior or to conform

his behavior to the requirements of the law.  Mont. Code Ann. § 46-14-101(1).

Thus, this argument implicates the validity of Warner's conviction and/or sentence,

and Warner has not demonstrated that the conviction or sentence has already been

invalidated; accordingly, Judge DeSoto was correct to refuse to consider this claim under *Heck*.

Warner raises no other objections concerning these medical claims except to argue that he declared under oath that he never told a medical provider that his shoulder pain was resolved. (Doc. 101 at 8.) While Warner is correct that this declaration is evidence, it does not establish a dispute of material fact as to any of his claims relating to medical treatment—the fact that he never informed a medical provider at FMHF that his shoulder pain was resolved does not establish that any of the Defendants made decisions that put him at a substantial risk of serious harm, as required to prevail on these claims. The Court finds no clear error in any of Judge DeSoto's findings as to these claims and adopts the findings and recommendations as to these claims in full.

### D.    Pat Searches

Judge DeSoto recommended summary judgment for Defendants on Warner's claim that FMHF's pat searches as residents leave the dining hall to return to their pods were excessive, concluding that the pat search policy was reasonably related to facility security, including sanitary and safety concerns about food or utensils being removed from the dining hall. (Doc. 101 at 22–23.)

Warner's objections rehash his argument that the pat searches are an "exaggerated response" and are objectively unreasonable relative to the facility's

security needs because they are unduly humiliating.  (Doc. 102 at 9.)  But the routine, fully-clothed pat searches he challenges bear no resemblance to practices held to be exaggerated responses or unduly humiliating, such as chaining detainees at all times outside their cells including during recreation, depriving inmates of meals and showers, and chaining naked detainees to their cell doors for hours.  *Shorter v. Baca*, 895 F.3d 1176, 1185–89 (9th Cir. 2018).  Warner's argument that the government must use the least restrictive means available to achieve its goals in the context of pat searches relies on inapplicable First Amendment free speech and RLUIPA religious rights cases.  (Doc. 102 at 9.)  Rather, the test is whether the post-meal pat searches are reasonably related to facility security, and Judge DeSoto correctly concluded that there was no genuine dispute of material fact that they were reasonably related to sanitary and safety concerns.  (Doc. 101 at 22–23.)

Warner asserts that FMHF's policy concerning pat searches does not mention conducting pat searches before patients leave the dining hall and only mandates pat searches upon admission to the facility.  (Doc. 102 at 9.)  However, the policy expressly authorizes pat searches "at any time," including "when returning to the pod."  (Doc. 75-4 at 4.)  There is no error in Judge DeSoto's findings concerning the policy.  In sum, Warner's objections concerning this claim are overruled, and Judge DeSoto's findings and recommendations as to this claim are adopted in full.

###### E.      Excessive Force

Judge DeSoto recommended summary judgment for Defendants on Warner's claims that they used excessive force against him on two occasions because (1) on June 8, 2017, staff responded reasonably in restraining Warner to transport him to D-pod and continuing to restrain him for two hours with constant observation in D-pod afterward because they determined he was acting aggressively and would not provide assurances that he would act safely; and (2) on June 25, 2017, staff responded reasonably in restraining Warner to transport him to D-pod for a visual search after leaving the dining hall when Warner refused a pat search, began physically moving as though he was warming up, and fought staff members when they attempted to take him to D-pod.  (Doc. 101 at 24–28.)  In particular, Judge DeSoto concluded that the force staff used in each instance was rationally related to a legitimate nonpunitive governmental purpose—the security and safety of the facility, its staff, Warner, and other residents—and the staff's actions did not appear excessive in relation to that purpose.  (*Id.*)

Warner argues that his claim relating to the June 8 incident should survive summary judgment because Defendants' decisions to lock Warner in his cell "simply to slide a piece of paper under his door" and to use a "show of force . . . to threaten and intimidate" him were objectively unreasonable under the standard for conditions of confinement claims.  (Doc. 102 at 3–4.)  Construing this argument as

an objection that Judge DeSoto applied the incorrect standard to these claims, the Court rejects that argument because Judge DeSoto considered the objective reasonableness of the force used in assessing this claim, which is the proper standard for both conditions of confinement and excessive force claims by pretrial detainees.  (Doc. 101 at 24–27.)

Likewise, the Court rejects Warner's argument that Judge DeSoto erred in recommending summary judgment for Defendants on this claim because "Defendants neither provide any evidence nor bother to argue why it was reasonable to lock Mr. Warner in his cell simply to slide a piece of paper under his door nor why they ordered a show of force to do so, if not to threaten and intimidate Mr. Warner."  (Doc. 102 at 3–4.)  Defendants presented evidence that, in the weeks leading up to this incident, Warner was engaging in escalating aggressive and disobedient behaviors toward both staff and patients, including threatening violence, which led to the decision to drop his level; the "piece of paper" Warner refers to is the notice that his level was being dropped because of his behavior.  (Doc. 75-9 at 4, 7, 9–10.)  Judge DeSoto correctly concluded that there was no genuine dispute of material fact that Defendants' actions—including locking down B-pod before serving the notice and restraining and secluding Warner when he responded aggressively—were rationally related to a legitimate

nonpunitive governmental purpose of maintaining safety and security within FMHF.  (Doc. 101 at 24–27.)

Warner argues that Judge DeSoto erroneously focused on the force necessary to transport him to D-pod and to restrain him while there while overlooking "the show of force ordered by Buck and Hill to threaten and intimidate Mr. Warner" and the discussion leading up to his restraint on June 8.  (Doc. 102 at 10.)  In particular as to June 8, he argues that several staff members had gathered around his door before the decision was made to transport him to D-pod, and Defendants' intent in ordering the staff to gather there was to antagonize him until he responded in a way that would justify his placement in D-pod.  (*Id.*)  While the video evidence does indicate that several staff members were present outside Warner's door at the time the notice was delivered, it also shows that Warner immediately responded angrily to being provided the notice that his level was being dropped and began shouting and arguing with the staff members, continuing for six minutes before he was told he could either calm down or go to D-pod; his response was, "Fuck you and D-pod," and when asked whether he would walk to D-pod, he responded, "Open the door and find out."  (Doc. 77, Ex. 28.)  The staff then locked down the building, and several minutes later, staff returned to his door with safety gear and again asked him to walk safely to D-pod; Warner continued to respond aggressively.  (*Id.*)  Warner's characterization of this event as staff

"stay[ing]" around his door for more than thirteen minutes simply to intimidate him (Doc. 103 at 10) is belied by indisputable video evidence; *he* extended the encounter beyond delivery of the notice by arguing with staff about his level being dropped, refusing to calm down, and refusing to agree to walk safely to D-pod. Likewise, Warner's objection concerning Judge DeSoto's characterization of his emergence from his cell as "charging" or "bursting" at staff is immaterial (Doc. 102 at 10–11); Warner's video-documented aggressive and threatening behavior during this encounter provides ample justification for the force used to restrain him and seclude him in D-pod regardless whether he "charged" at staff when his cell door was opened.

As to the June 25 restraint, Warner objects that Judge DeSoto ignored Neu's statement that "He's pissing me off" as evidence of malicious intent and the fact that Warner was not searched that morning.  (Doc. 102 at 11.)  Neither of these facts creates a genuine dispute of material fact as to whether the force used against Warner on June 25 was objectively reasonable and not excessive in relation to a legitimate nonpunitive governmental purpose.  Before departing for breakfast, Warner initially refused to submit to a pat search upon his return but attempted to leave B-pod anyway, forcing staff to shut the door and delaying several other B-pod residents' departure for breakfast despite their compliance with facility rules. (Doc. 77, Ex. 37a.)  After Warner agreed to submit to a pat search, he and the other

remaining residents were allowed to leave, and only staff members were present when Neu quietly said "He's pissing me off" before discussing with other staff who should be present when the residents returned to the pod in case Warner acted out.  (*Id.*; Doc. 77, Ex. 37b.)  No reasonable factfinder could conclude that this expression of frustration with Warner's obstinate behavior is evidence of an expressed intent to punish through the use of excessive force.  The Court has reviewed the video evidence related to this incident and finds no error in Judge DeSoto's findings and recommendations related to the June 25 incident; in addition to the evidence cited by Judge DeSoto, Warner refused repeatedly to be pat searched or to walk to D-pod, and when staff approached with safety gear, Warner can be heard saying "You don't want to get hurt."  (Doc. 77, Ex. 38.)  There is no genuine dispute of material fact as to whether the staff's use of force was objectively reasonable under the circumstances.  Accordingly, Warner's objections concerning his excessive force claims are overruled, and Judge DeSoto's findings and recommendations as to these claims are adopted in full.

### F.      Qualified Immunity

Judge DeSoto concluded that, based on the foregoing analysis, Defendants did not violate Warner's constitutional rights, and they thus were entitled to qualified immunity.  (Doc. 101 at 28–29.)  Although Warner did not object specifically to the finding of qualified immunity, to the extent his objections to

Judge DeSoto's findings and recommendations concerning the alleged constitutional violations are construed as also objecting to the qualified immunity finding, they are overruled for the reasons explained above, and Judge DeSoto's findings and recommendations as to Defendants' qualified immunity are adopted in full.

## II.     Non-Dispositive Motions

Warner objects to Judge DeSoto's rulings denying his motion for sanctions (Doc. 101 at 31) and granting Defendants' motion for leave to file an over-length brief (Doc. 97).  (Docs. 99, 102 at 11–12).  The Court may reconsider those non-dispositive rulings only "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).  The Court has carefully reviewed Warner's objections to these non-dipositive rulings and finds no clear error or legal error in Judge DeSoto's rulings.

Judge DeSoto denied Warner's motion for sanctions for several reasons. First, Warner failed to comply with the requirement that parties meet and confer regarding disputed discovery issues before filing a motion, because his only attempt to fulfill that requirement was a letter he sent more than a year before he filed the motion.  (Doc. 101 at 29–30.)  And second, the discovery issues Warner complained of—delayed verification pages, which were quickly rectified once Warner's motion called Defendants' counsel's attention to the issue—do not

warrant the sanctions Warner requested, which were denial of Defendants' motion for summary judgment or payment of $1000 each. (*Id.* at 29–31.) Warner objects that he literally cannot comply with the meet and confer requirement because defense counsel must arrange telephonic communication with Warner and argues that the Court *must* strike an unsigned paper pursuant to Rule 11 of the Federal Rules of Civil Procedure. (Doc. 102 at 11–12.) Even if the Court were to excuse Warner's failure to meet and confer telephonically with Defendants' counsel, Judge DeSoto did not err in refusing to impose the drastic sanctions Warner requested. Warner did not rely on Rule 11 in his initial motion for sanctions, but even if he had, the Rule states that the Court "must strike an unsigned paper *unless the omission is promptly corrected after being called to the attorney's or party's attention.*" Fed. R. Civ. P. 11 (emphasis added). That is precisely what happened here. Defendants' discovery responses were substantively complete, and the issue of a missing verification page was corrected shortly after Warner filed his motion. (Doc. 100 at 7–8.) The Court finds no factual or legal error in Judge DeSoto's order denying Warner's motion for sanctions and will not reconsider it.

Warner objects to Judge DeSoto's order granting Defendants' motion to file an over-length brief because he did not have an opportunity to respond, arguing he was prejudiced because he would have no opportunity to reply to Defendants' reply brief and that Judge DeSoto was biased in Defendants' favor. (Doc. 99.)

26

Warner's allegations of bias are supported only by his subjective perception of Judge DeSoto's rulings in this case, and Judge DeSoto's decision to grant the motion without awaiting Warner's reply was procedurally reasonable in light of the impending filing deadline and substantively reasonable in light of Defendants' bases for the motion—namely, Warner's overlength opposition brief (Doc. 96). The Court finds no factual or legal error in Judge DeSoto's order and will not reconsider it.

### CONCLUSION

IT IS ORDERED that Warner's objections (Docs. 99, 102) are OVERRULED.

IT IS FURTHER ORDERED that Judge DeSoto's Findings and Recommendations (Doc. 101) are ADOPTED IN FULL.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (Doc. 73) is GRANTED.

IT IS FURTHER ORDERED that Warner's motion to expedite (Doc. 106) is DENIED as moot.

IT IS FURTHER ORDERED that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.

The Clerk of Court is directed to enter judgment in favor of Defendants and close this case.

DATED this 31st day of October, 2022.

Dana L. Christensen, District Judge
United States District Court